CARTERET SAVINGS AND LOAN ASSOCIATION, F.A., A FEDERALLY CHARTERED SAVINGS AND LOAN ASSOCIATION, PLAINTIFF, v. BURTON R. DAVIS AND MOZELL Y. DAVIS, HIS WIFE, FIRST NATIONAL BANK OF NEW JERSEY, RUTGERS MINORITY INVESTMENT COMPANY AND THE STATE OF NEW JERSEY, DEFENDANTS, AND THE MONEY STORE, DEFENDANT-RESPONDENT.

Argued October 6, 1986—Decided March 10, 1987.

*Steven Kropf* argued the cause for appellant Constance Silakoski (*Marvin Feingold,* attorney).

*Sanford J. Becker* argued the cause for respondent (*Zucker, Goldberg, Becker & Ackerman,* attorneys).

The opinion of the Court was delivered by

O'HERN, J.

This case concerns a complication in a mortgage foreclosure sale. The question is whether a junior mortgagee who has acquired the debtor's title at a prior foreclosure sale also acquires the limited ten-day right to redeem property after a foreclosure sale that the original debtor-mortgagor possesses by virtue of this Court's decision in *Hardyston v. Tartamella,* 56 *N.J.* 508 (1970).

In 1976, Burton R. Davis and Mozell Y. Davis executed a second mortgage to the Modern Acceptance Corporation to secure a loan for $11,000. This second mortgage was assigned to the Money Store. The property was the subject of a first mortgage held by the Carteret Savings & Loan Association as security for a loan of $56,000. The Money Store foreclosed on the second mortgage when the mortgagors defaulted upon the

second and all subsequent payments. The mortgagors were later adjudicated bankrupt. The Money Store filed its foreclosure complaint thirteen months before the filing of a similar complaint by Carteret Savings & Loan Association.

A Final Judgment in the foreclosure action was entered and the Money Store was the successful bidder at the sheriff's sale held July 13, 1983. It assigned its bid to a subsidiary, Major Brokerage Co. (We shall hereafter refer to both interests as if held by the Money Store.)

The first mortgagee, Carteret Savings & Loan Association, also foreclosed on the property, causing the property to be sold to raise the $80,418 due on its mortgage at a sheriff's sale on March 7, 1984. Due to a scheduling conflict, no representative of the Money Store was able to attend the sale. The high bidder at the sale was Constance Silakoski. She bid $81,000. Although Silakoski's name does not appear in the caption, she is the real party in interest here.

After the sale, a representative of the Money Store tendered to the sheriff within the statutory period of redemption the amount required for redemption of the Carteret mortgage. See R. 4:65–6(c). Silakoski objected to the sheriff's acceptance of the offer and this action ensued. The Law Division, on the Money Store's action to compel the sheriff to accept the redemption, found "no reason to rule that the extended right to redeem does not apply to a * * * title holder in the Money Store's position * * *."

The Appellate Division affirmed. 200 *N.J.Super.* 167 (1985). In its view, as the purchaser at the foreclosure sale, the Money Store acquired all the rights of the owner with respect to the mortgaged premises, subject only to the lien of the other outstanding mortgage. Thus, the Money Store acquired the right of redemption, including the limited right to redeem within ten days after the sale, and the exercise of that right by its assignee was proper. 200 *N.J.Super.* at 171. The premises have since been conveyed to a third party for $90,000. We

granted petitioner Silakoski's request for certification. 103 *N.J.* 485 (1986).

## I.

A brief and by no means definitive review of the course of the law of mortgages helps to place the issue in perspective. An interested reader may review the materials contained in *G. Osborne, Mortgages* (1951), and Durfee, "Redemption From Foreclosure Sale—The Uniform Mortgage Act," 23 *Michigan L.Rev.* 825 (1925) and with respect to New Jersey practice, Weinstein, "Foreclosure and Deficiency Actions in New Jersey," *New Jersey Law Journal* December 11, 1986, at 1, col. 1 (hereafter "Foreclosure").

The right of redemption evolved as a right of the debtor in equity to prevent the loss of the property at any time before the judgment of foreclosure. The early mortgage was in form a conveyance to secure the performance of an obligation. The mortgagee received a title in fee subject to a condition subsequent. The mortgagor, however, remained in possession and the conveyance became void upon completion of the obligation. In the event that the mortgagor defaulted, she or he lost the property, and in addition remained liable for the entire debt. It was simply a forfeiture.

Eventually, equity intervened to recognize the true nature of the transaction as one of security, not conveyance, and to rearrange the interests of the parties accordingly. Soon the notion took root that the right to redeem attached immediately upon creation of the mortgage. It could not summarily be surrendered, at least to the mortgagee. The value of the land above the loan gradually became entitled to protection in equity. This became known as the "equity of redemption," a valuable right that came to be seen as an equitable estate in land that was alienable, devisable, and descendible. *See Lobsenz v. Micucci Holdings, Inc.*, 127 *N.J.Super.* 50 (App.Div. 1974) (right of redemption from a foreclosure sale as an exten-

sion of the equity of redemption is subject to transfer and conveyance as any other right, title or interest in or to real property). In some states the second mortgage is considered a lien on this equitable estate.

In order to equalize the relationship, equity gave to the mortgagee the power to foreclose the mortgagor's interest in the property, including the mortgagor's right to redeem the property from the lien. Once able to perfect his or her title, the mortgagee needed a means of making liquid the new asset to satisfy the debt owed. Hence the judicial sale developed as a means of assuring that a fair value would be received for the property as part of the foreclosure proceedings.

The convulsive events of the Depression of the 1930s set the stage for the creation of further legislative protection of mortgagor-debtors in the form of the statutory right of redemption. Many states passed laws forbidding the mortgagee from depriving the mortgagor of title in the course of the mortgage foreclosure process. Some states extended that time for as much as six months, others for a year. Under the statutes, a mortgage debtor could regain property sold at a foreclosure sale by paying to the buyer the purchase price.

At the time of the *Hardyston* decision, New Jersey did not have a statutorily-created right of redemption. The equity of redemption carried with it only the right to forestall the foreclosure. Once the foreclosure and judicial sale took place, the mortgagor had no further right or interest in the property.

Originally, a judicial sale was not considered final, however, until the purchaser complied with the conditions of the sale and the sale was confirmed. If the purchaser failed fully to comply, the mortgagor's equity of redemption was restored. *Ghee v. Davenport,* 2 *N.J.Super.* 532 (Ch.Div.), *aff'd,* 4 *N.J.Super.* 518 (App.Div.1949). This was the prevailing practice in New Jersey. The practice was modified by a Rule revision in 1948 that made the judicial sale the final event but gave the debtor or

anyone with an interest in the property ten days to object to the confirmation of the sale. 1948 *Rule* 3:77–5 (now *R.* 4:65–5).

This was the background that faced the Court at the time of the *Hardyston* decision. That Court concluded that the debtor should have the further opportunity to redeem the property within the ten days between the sale and its becoming final. *Hardyston* noted that recognition of the "right of redemption" after sale encourages bidding based on value because the purchaser at the foreclosure sale knows that a bid that does not approximate value will stimulate the debtor to make a last-ditch effort to regain the property at the artificially deflated price. 56 *N.J.* 513–14, citing *First Nat'l Bank & Trust Co. v. MacGarvie*, 22 *N.J.* 539, 545–47 (1956). While recognizing that the situation would be rare in which a foreclosed mortgagor could successfully redeem after the sale, the *Hardyston* Court reasoned that the historically favored status of the right of redemption in the mortgagor argued for its extension through the ten-day period for objections.

## II.

The relevancy of this policy to the situation of the junior mortgagee that has acquired the debtor's title is not immediately clear. We note that the ultimate question is strictly one of policy. There is no legal concept that resolves this issue. The junior mortgagee here urges us to adopt the rule that casts the right of redemption as a protection for the ownership interest in the property whether or not held by the original debtor. But that property right in the original debtor, although assignable, is not absolute. Even in a case of voluntary assignment, "intense judicial scrutiny is warranted." *Heritage Bank v. Magnefax Corp.*, 194 *N.J.Super.* 376, 380 (Ch.1984).

While state legislatures may have chosen in their redemption statutes thus to extend the right, the policy at equity appears to have been more narrowly focused, ultimately intended to benefit only the original debtor. Our touchstone in considering this

issue is the historical policy in equity of protecting the debtor's interest in the mortgaged property.

As noted, of the states that have created statutory rights of redemption, most, but not all, have extended that right to parties other than the original debtor itself. Some extend the right only to preferred interest holders—the debtor, or his "heirs, executors, administrators, assigns, or any person interested in the premises through or under the defendant * * *." *Illinois Nat'l Bank of Springfield v. Gwinn*, 390 *Ill.* 345, 351, 61 *N.E.*2d 249, 253 (1945).

The question that we must decide is whether the historical policy is implicated in the circumstances of the junior mortgagee's foreclosure. In an appealing argument to our better nature, the purchaser at the foreclosure sale contends that the *Hardyston* issue should be seen in terms of protecting only "the little guy." However, we have some difficulty in picking out the little guy in the group that attends such a foreclosure sale. Generally only those with an interest in the foreclosed property are present. They seek to protect their interest by recovering the foreclosed property for the lowest possible bid. While mortgagors are often legally and financially innocent people, "afficionados of sheriff's sales are not always solicitous of the rights of debtors." *Heritage Bank v. Magnefax Corp., supra,* 194 *N.J.Super.* at 380.

Most mortgage lenders are necessarily sophisticated in the ways of the marketplace. Second mortgagees who are often institutional lenders hardly fit the mold of the financially strapped property-owner in need of the aid of a court's equitable powers. Other bidders at foreclosure sales are or had better be well informed about the process as well because the risks are many. There is no guarantee that the purchaser will acquire a marketable title. Any defect or irregularity in the debtor's title or the foreclosure proceeding results in a bidder receiving no title at all. "Foreclosures," *supra,* at 25, col. 3.

When the second mortgagee has become the owner, and the first mortgagee is foreclosing that second mortgagee's interest, the original debtor or mortgagor has already lost the title. The debtor would likely have an interest only "if he is entitled to payment of some excess." *Heritage Bank v. Magnefax Corp.,* *supra,* 194 *N.J.Super.* at 380. The extension of the right of redemption is unlikely directly to benefit the debtor. The question then becomes whether giving the right of redemption to the foreclosing mortgagee in some indirect way advances the debtor's interest.

The debtor faces two risks in foreclosure: loss of property and subsequent personal liability for the deficiency. If either of these hazards could be ameliorated by the extension of the redemption right of a junior mortgagor, the equitable policy would be vindicated. Obviously, the title has been lost. Only the question of deficiency remains.

We turn briefly to the issue of deficiency proceedings governed by *N.J.S.A.* 2A:50–1 to –12. The theory behind the public sale of mortgaged premises is to afford special protection to the debtor-owner, first by insuring the return of any equity represented by the surplus of the sale over the mortgage debt, and second by effectively establishing the fair market value of the mortgaged premises to avoid oppressively high deficiency judgments. "Foreclosures," *supra,* at 24, cols. 2–3. However, foreclosure sales rarely, if ever, bring the fair market value of the foreclosed property. A recent ten-year study of sheriff's sales in one county showed that 89% of the foreclosure sales resulted in nominal bid acquisitions ($300 or less) by the mortgagee. The mortgagee was forced to bid above the nominal amount in a mere 3% of the sales. Outside bidders purchased for an amount equalling the mortgagee's debt, interest, cost, and sheriff's fees in only 3% of the sales. "Foreclosures," *supra,* at 24. There is legislative recognition of this reality in *N.J.S.A.* 2A:50–3 and *N.J.S.A.* 2A:50–22, which permit certain foreclosed debtors or the debtors' successor in interest or guarantor to dispute the amount of the deficiency, by demon-

strating the fair market value of the property foreclosed. Once the court establishes fair value, it will credit the mortgagor the difference between the debt owed and the fair value of the property regardless of the price received. *N.J.S.A.* 2A:50–3.

We discern two possible consequences in extending the right of redemption. Theoretically, broadening the class of those interest holders able to redeem could increase the risk of redemption, thereby encouraging speculative purchasers at the judicial sale who want to avoid a post-sale redemption to bid in an amount closer to the true value of the property. Increasing pressure to bid up the price would ameliorate the risk of an excessive deficiency judgment. The problem with this analysis is that the amounts due on subsequent mortgages are rarely established in the senior lienor's foreclosure. *Rule* 4:64–1(b) essentially continues the former equity practice that permitted junior mortgagees to file an answer not disputing the prior mortgage but asking that their liens be reported. 30 R. Cunningham and S. Tischler, *New Jersey Practice* § 245 n. 28 (1975) (citing 1947 *Chancery Rule* 195). Contests about priorities and amounts due on subsequent mortgages will ordinarily await the generation of any surplus. *R.* 4:64–3. If no surplus results, the disputes are left unresolved in the first mortgagee's foreclosure. 30 *New Jersey Practice, supra,* § 245. Reality intrudes further in a case like this in which the original debtor has filed for bankruptcy.

The other possible consequence is that extending the redemption right would further undermine the stability of such sales without any attendant benefit. As noted, ordinarily the first mortgagee, in order to avoid the sheriff's fees, simply bids in a nominal sum and awaits other bids. It is likely that the low turnout of third parties who actually buy property at foreclosure sales reflects a general conclusion that the risks of acquiring an imperfect title are often too high. Prospective bidders may be further discouraged by the even greater potential for delay created by an extension of the ten-day right of redemption to interest-holders other than the mortgage debtor.

These purchasers may not want to tie up their funds awaiting the outcome of the ten-day period, one more of the endless contingencies that beset a bidder at a judicial sale. "Foreclosures," *supra*, at 25, cols. 3–4. Further, competitive institutional lenders vying for the most favorable results can hold back and exercise the redemption after the outcome of the sale is known.

Although the decision of the Appellate Division was limited in scope to the narrow circumstance in which a junior mortgagee inadvertently omits to attend a scheduled sale, we fail to discern how even such a narrowly construed policy advances any interest of the debtor. In short, so speculative is the benefit of extending the right of redemption beyond the voluntary transfer sanctioned by *Lobsenz, supra,* 127 *N.J.Super.* 50, that we see no benefit in doing so. In the *Lobsenz* situation we easily recognize the benefit to the owner-debtor of allowing him or her to realize the value of the right of redemption by a transfer of this asset.

We note that unlike the legislatures of many other states, our Legislature has never chosen explicitly to extend by statute the right of redemption after the foreclosure sale to parties in interest other than the debtor. Given the reality of the foreclosure market, an assumed extension of this right beyond the original debtor likely will do nothing more than inject further uncertainty into a process already fraught with risks. Of course, there may be cases when an examination of the bids will disclose that the original debtor would genuinely benefit from the extension of the right to subsequent title holders. Should we err in our view of the economic implications of this ruling, we are confident that our Civil Practice Committee will bring to our attention any need to revise the current rule to conform with the realities of the situation.

As noted, since Ms. Silakoski did not seek to stay the judgment below, the property was conveyed by the Money Store to a third party. Although Ms. Silakoski's investment might well have

appreciated considerably, it may be unfair to question that title now. On remand, the trial court shall fashion a remedy to award Ms. Silakoski a reasonable benefit from the actual excess over the Carteret first mortgage realized by the Money Store on the sale.

The judgment of the Appellate Division is reversed and the matter remanded to the Law Division for entry of judgment in accordance with this opinion.

*For reversal and remandment* —Chief Justice WILENTZ, and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*For affirmance*—none.